*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0202P (6th Cir.)
File Name: 03a0202p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

————————————

JOHN CLIFFORD TESMER;
CHARLES CARTER; and ALOIS
SCHNELL, on behalf of all
similarly situated individuals;
ARTHUR M. FITZGERALD; and
MICHAEL D. VOGLER,
     *Plaintiffs-Appellees,*
     *v.*

JENNIFER M. GRANHOLM,
Attorney General,
     *Defendant,*
JUDGE JOHN F. KOWALSKI;
JUDGE WILLIAM A. CRANE;
and JUDGE LYNDA L.
HEATHSCOTT, in their official
capacities, individually and as
representatives of a class of
similarly situated circuit court
judges,
     *Defendants-Appellants*
     *(00-1824),*
JUDGE DENNIS C. KOLENDA,
     *Appellant (00-1845).*

Nos. 00-1824/1845

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 00-10082—Victoria A. Roberts, District Judge.

Argued: December 11, 2002

Decided and Filed: June 17, 2003

Before: MARTIN, Chief Circuit Judge; BOGGS,
NORRIS, SILER, BATCHELDER, DAUGHTREY,
MOORE, COLE, CLAY, GILMAN, GIBBONS, and
ROGERS, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Thomas L. Casey, OFFICE OF THE
ATTORNEY GENERAL, Lansing, Michigan, Judy E.
Bregman, BREGMAN & WELCH, Grand Haven, Michigan,
for Appellants. David A. Moran, WAYNE STATE
UNIVERSITY LAW SCHOOL, Detroit, Michigan, for
Appellees. **ON BRIEF:** Thomas L. Casey, OFFICE OF
THE ATTORNEY GENERAL, Lansing, Michigan, Judy E.
Bregman, BREGMAN & WELCH, Grand Haven, Michigan,
for Appellants. David A. Moran, WAYNE STATE
UNIVERSITY LAW SCHOOL, Detroit, Michigan, Mark
Granzotto, Royal Oak, Michigan, for Appellees.

   MARTIN, C. J., delivered the opinion of the court, in
which BOGGS, DAUGHTREY, MOORE, COLE, CLAY,
and GILMAN, JJ., joined. ROGERS, J. (pp. 35-47),
delivered a separate opinion concurring in part and dissenting
in part, in which SILER, BATCHELDER, and GIBBONS,
JJ., joined. NORRIS, J. (pp. 48-56), delivered a separate
dissenting opinion, in which SILER, BATCHELDER, and
GIBBONS, JJ., joined.

## OPINION

BOYCE F. MARTIN, JR., Chief Circuit Judge.  In 1994, Michigan's voters passed an amendment to the Michigan constitution precluding criminal defendants who plead guilty, guilty but mentally ill, or nolo contendre from receiving an appeal of right.  Rather, these defendants may appeal only by leave of the Michigan Court of Appeals.  Several Michigan state judges began to deny appointed appellate counsel to indigent defendants who pled guilty or nolo contendre, a practice that the state legislature codified.  Three indigent defendants who were denied appointed appellate counsel brought an action in the Eastern District of Michigan under 42 U.S.C. Section 1983, alleging that the practice and the statute violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. The group of plaintiffs also included two attorneys who accept appointments in criminal proceedings.  The defendants in this action were three Michigan circuit court judges who had denied the indigent plaintiffs appointed appellate counsel and the state attorney general.

After a hearing on motions, the district court found that the plaintiff attorneys had third-party standing and that the court should abstain from hearing indigent Tesmer's claims.  The court further declared the challenged statute and practice unconstitutional, but issued no separate judgment or decree. After defendant Judge Lynda Heathscott and non-party Judge Dennis Kolenda refused to appoint appellate counsel for non-party indigents, plaintiffs sought injunctive relief and class certification.  The district court entered an injunction against Heathscott and Kolenda, denied certification of a class of judge-defendants, and bound all Michigan state judges to the injunction.

We dismissed an earlier appeal by defendants after their notice of appeal misidentified the  March 31 opinion and order.  We denied the subsequent petition for rehearing on the

ground that the district court's order was not a final judgment. The defendants again appealed after issuance of the injunction, and a panel of this court heard the appeal.  A majority of judges of this court elected to rehear the appeal en banc.  We now AFFIRM the district court in part and REVERSE in part, holding that *Younger* abstention applies to the indigents but that the attorney-plaintiffs have third-party standing.  We agree that the statute and practice are unconstitutional, but we hold that the injunction was improper with respect to Judge Kolenda and all non-party Michigan state judges.

## I.   BACKGROUND

In 1994, Michigan voters amended the state constitution to eliminate appeals as of right for criminal defendants who plead guilty, guilty but mentally ill or nolo contendre.[1]  Mich. Const. Art I, §20.  Such defendants must file petitions for appeal, and the Michigan Court of Appeals may grant leave to appeal after review of the petitions.

Several state judges began to deny appointed appellate counsel to those indigents who pled guilty.  Judges John F. Kowalski, William A. Crane, and Lynda Heathscott denied appointed appellate counsel to indigent plaintiffs John C. Tesmer, Charles Carter, and Alois Schnell after these plaintiffs pled guilty in criminal proceedings.

The practice was later codified by Michigan's legislature in 2000.  The statute provides that those who plead guilty generally "shall not have appellate counsel appointed for review of the defendant's conviction or sentence." Mich. Comp. Laws Ann. § 770.3(a)(1).

The statute provides exceptions to this general prohibition. The court *must* appoint counsel to aid in review of the

---

[1] For simplicity, we will refer only to guilty pleas, though our analysis will apply to pleas of guilty but mentally ill and nolo contendre, as contained in the statute.

conviction or sentence when one of four situations occurs: 1) the prosecution seeks appeal, 2) the sentence exceeds the upper end of the guidelines range, 3) the defendant's petition for appeal is granted, or 4) the defendant has entered a conditional plea. Mich. Comp. Laws. § 770.3(a)(2).

The court also has the discretion to appoint counsel if three situations all occur related to sentencing: 1) the defendant alleges that the sentence was based on improper scoring of the offense or prior record, 2) the defendant objected to the scoring or preserved the matter for appeal, and 3) the sentence was an upward departure from the upper limit of the range that the defendant alleges should have been scored. Mich. Comp. Laws Ann.§770.3(a)(3).

The effect of the statute is that most indigent defendants who plead guilty will be denied appointed counsel when applying for leave to appeal. Only very limited circumstances will require appointed counsel to help with a petition for appeal.

Together with two attorneys who accept appointments as criminal defense counsel, Arthur M. Fitzgerald and Michael D. Vogler, the indigents brought an action on March 20, 2000, against the three judges and the state attorney general in federal district court under 42 U.S.C. § 1983. The state attorney general was later found to be an improper party and is not part of this appeal. The indigents alleged that both the statute and practice of denying appointed appellate counsel after guilty pleas violated their Fourteenth Amendment rights to Due Process and Equal Protection. The attorney-plaintiffs allege that the statute violated their rights by denying them the opportunity to represent indigents in seeking leave to appeal. The plaintiffs sought declaratory relief, as well as permanent and preliminary injunctions.

The district court on March 31, 2000, issued an order and opinion after a hearing, finding that the attorney-plaintiffs had third-party standing to represent the rights of indigents and that the indigents had standing. *Tesmer v. Granholm*, 114 F. Supp. 2d 603 (E.D. Mich. 2000). The court decided to

abstain from hearing Tesmer's claim because of a pending state court action involving Tesmer. The court ultimately granted declaratory relief, ruling that the statute and practice were both unconstitutional under the Equal Protection and Due Process Clauses. The court would not impose an injunction against the judges, reasoning that Section 1983 forbids injunctive relief against judges for acts or omissions in their judicial capacity, unless they violated a declaratory decree or declaratory relief was unavailable.

The judges appealed on April 10, 2000, under a case numbered 00-1405. A panel of this court, however, dismissed the appeal on July 13. The judges had mistakenly based their appeal upon the issuance of a final decree, which we ruled was not actually a final judgment ripe for appeal.

Meanwhile, on May 9, after Judge Heathscott denied appellate counsel to a non-party indigent defendant and after non-party state Judge Kolenda had denied appointed appellate counsel in several cases, the plaintiffs moved for injunctive relief against those two judicial defendants. The district court enjoined Judges Heathscott and Kolenda from denying appointed counsel. *Tesmer v. Kowalski*, 114 F. Supp. 2d 622, 629 (E.D. Mich. 2000). Expanding this injunction, however, the district court held that the earlier ruling that the statute and practice were unconstitutional bound all Michigan state judges. Though plaintiffs had requested certification of a class of judges similarly situated to the named defendants, the district court denied certification and simply expanded the reach of its injunction.

The three named judges in the initial suit and Judge Kolenda appealed from the June 30 order. A panel of this court held that abstention barred review of any of the named indigents' claims and that the attorneys had third-party standing. It reversed the district court and held that the denial of appointed appellate counsel did not violate the United States Constitution.

We granted rehearing en banc. We agree with the district court that the attorney-plaintiffs have third-party standing but

hold that none of the indigents' claims may be heard under abstention principles. We also uphold the district court in finding that denial of appointed appellate counsel following guilty pleas is unconstitutional. Finally, we hold that the district court could not enjoin Judge Kolenda or all Michigan state judges who were non-parties to the suit.

## II.   ANALYSIS

The judges argue that the district court should have abstained because ongoing proceedings in Michigan state courts gave the indigent plaintiffs adequate opportunity to bring their constitutional claims. They also urge us to hold that the attorney-plaintiffs did not have third-party standing.

### *Abstention*

In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court advised federal courts to abstain from deciding a matter that would be properly before them but for the pendency of state criminal proceedings in the matter. *Id*. at 43-45. Such deference to state proceedings is essential to the doctrine of "Our Federalism." *Id*. at 44. In a companion case, the Court held that the rule in *Younger*, which applies to an action seeking injunctive relief, applies as well to prohibit an action seeking declaratory relief when a state criminal prosecution is pending. *Samuels v. Mackell*, 401 U.S. 66, 73 (1971).

We look at three factors to determine if *Younger* abstention is warranted: (1) whether the underlying proceedings constitute an ongoing state judicial proceeding, (2) whether the proceedings implicate important state interests, and (3) whether there is an adequate opportunity in the state proceedings to raise a constitutional challenge. *Tindall v. Wayne County Friend of the Court*, 269 F.3d 533, 538 (6th Cir. 2001); *see also Cooper v. Parrish*, 203 F.3d 937, 954 (6th Cir. 2000); *Zalman v. Armstrong*, 802 F.2d 199, 201-02 (6th Cir. 1986). We review the district court decision regarding abstention de novo. *Tindall*, 269 F.3d at 538.

First, when determining if state court proceedings involving the plaintiffs are pending, we look to see if the state court proceeding was pending at the time the federal complaint was filed. *Zalman*, 802 F.2d at 204. It remains pending until a litigant has exhausted his state appellate remedies. *Huffman v. Pursue, Ltd*., 420 U.S. 592, 609 (1975); *Foster v. Kassulke*, 898 F.2d 1144, 1146 (6th Cir. 1990). Finally, if state habeas corpus relief is available, a claim may be considered pending in state court for the purpose of analyzing abstention. *Foster*, 898 F.2d at 1146.

The parties agree that abstention applies only to the indigent plaintiffs and not to the attorney-plaintiffs. Tesmer pled guilty to a home invasion charge, then requested appellate counsel to assist in preparing an application for leave to appeal, a request denied on September 7, 1999. The district court abstained from adjudicating Tesmer's claim because he was a party to a pending state court action, had an adequate opportunity to raise constitutional challenges in the state court proceeding, and no extraordinary circumstances justified interference in the state court proceedings. Appellees do not challenge this decision.

Carter is also party to a proceeding in state court, but the district court found abstention inappropriate as to him because he lacked the opportunity to bring a constitutional challenge, the third factor.

Finally, the district court found that Schnell had no pending state action, as his application for leave to appeal and request for rehearing were denied. Under Michigan's procedural rules, Schnell had fifty-six days to file a delayed application for leave to appeal with the Michigan Supreme Court. The district court found that Schnell's state action was completed at the time the federal complaint was filed, so abstention was not warranted as to him.

We disagree. Our holding in *Foster* allows abstention where a litigant has abandoned pursuit of state court relief. 898 F.2d at 1146. In *Foster*, the plaintiff filed a Section 1983 complaint challenging both a Kentucky statute that limited the

amount of compensation her appointed counsel could receive and the practice of not providing a trial transcript. *Id*. at 1145. When she filed her federal suit, her claims had been denied in state court. We said, however, that she could pursue claims on direct appeal and, if unsuccessful, could resort to state habeas relief. *Id*. at 1146-47. By seeking injunctive relief in a Section 1983 action, she was attempting to obtain federal review of state procedures in a criminal case before the state court could decide them fully. *Id.* Similarly, in *Huffman*, the plaintiff chose not to appeal an adverse trial outcome and filed suit in federal court. 420 U.S. at 598. The plaintiff argued that abstention should not apply because the state proceedings had ended. *Id*. at 608. The Court disagreed, stating that "a party . . . must exhaust his state appellate remedies before seeking relief in the District Court." *Id*. Schnell's failure to pursue his claim by filing a delayed application for leave to appeal in the Michigan Supreme Court or by filing a state habeas corpus action equates to a failure to exhaust state court remedies.

Thus, we conclude that each of the indigent plaintiffs had ongoing state court proceedings at the time the federal complaint in this action was filed. We turn next to the third factor, whether plaintiffs had an adequate opportunity to raise constitutional claims in state court.

A federal plaintiff arguing that he had an inadequate opportunity to raise constitutional claims in state court "has the burden to show that state procedural law barred presentation of [its] claims." *Armco, Inc. v. United Steelworkers of Am.*, 280 F.3d 669, 682 (6th Cir. 2002) (alteration in original). If the plaintiff had an opportunity to present his federal claim in state court proceedings, a federal court should not exercise jurisdiction over the claim. *Moore v. Sims*, 442 U.S. 415, 425 (1979). On the other hand, if authority clearly shows that state law barred the presentation of the constitutional claims in state court, abstention is not appropriate. *Id*. at 425-26; *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987).

We agree with the district court's finding that Tesmer had an adequate opportunity to present his federal claims in state court because he filed a "lawyerly brief" seeking a delayed application for leave to appeal. The district court found that Carter did not have an adequate opportunity because he had no attorney and no knowledge of law. We disagree, for if Tesmer could raise the claim, Carter could also present his claims. Whether he had the legal sophistication to succeed in his application for leave to appeal or needed counsel to assist does not address the abstention issues, but instead addresses the merits of the constitutional claim. Furthermore, a state supreme court case that was ongoing during this appeal constituted an example of the opportunity to raise the constitutional issues in a state proceeding. *See People v. Bulger*, 614 N.W.2d 103 (Mich. 2000), *cert. denied*, 531 U.S. 994 (2000). In that case, an indigent defendant appealed from the denial of his motion for appointed appellate counsel following a guilty plea for cocaine and marijuana possession. *Id*. at 105-06. During the pendency of *Bulger*, the statute in question here was enacted; thus, it did not apply to defendant Bulger. The Michigan Supreme Court expressly stated that it was not considering the constitutionality of the statute. *Id*. at 107. After finding no authority, either state or federal, mandating appointment of counsel following a guilty plea and finding that indigents do have meaningful access to appeals, the court remanded to the trial court so that Bulger could pursue an application for leave to appeal his convictions. *Id*. at 114-15.

Our conclusion that the district court should have abstained does not foreclose any appeal by the indigents. Once state proceedings are concluded, a litigant may choose to pursue a constitutional claim in a federal forum, and the federal court may choose to exercise jurisdiction. *See Huffman*, 420 U.S. at 606. Finally, as the district court did with respect to Tesmer, we consider whether extraordinary circumstances would allow federal jurisdiction despite the strong case for abstention. We analyze the circumstances of all three indigent plaintiffs together, however, because of the similarity of their situations.

In *Younger* the Court stated that federal interference with state proceedings may be allowed where irreparable injury is "great and immediate;" where state law flagrantly and patently violates express constitutional prohibitions; or where parties make a showing of bad faith, harassment, or unusual circumstances that require equitable relief to remedy. 401 U.S. at 46, 53-54. The district court concluded, as do we, that plaintiffs did not demonstrate any such extraordinary circumstances.

We conclude that the district court should have abstained from hearing the claims of all three indigent plaintiffs, and we reverse its decision that only Tesmer's claims warranted abstention.

### Third-Party Standing

The state judges contend that the two attorney-plaintiffs do not have standing to raise the constitutional challenge to the statute because they are asserting the rights of third parties and have not suffered an injury in fact. The attorney-plaintiffs alleged in their complaint that they receive income when they accept appointments as appellate counsel for criminal defendants and that the statute will reduce the number of cases in which they would receive such appointments, thus reducing the income they receive.

The district court found that the doctrine of *jus tertii,* or third-party standing, applies to the attorney-plaintiffs. We agree.

Ordinarily a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1976). The Court, however, has allowed the rule to be disregarded when plaintiffs meet certain requirements, articulating the requirements in *Powers v. Ohio*, 499 U.S. 400 (1991). In allowing a criminal defendant to bring suit on behalf of black citizens who had been struck from a jury , the Court permitted a litigant to bring suit on behalf of a third party if 1) the litigant has stated an injury in fact, 2) the

litigant has a close relation to the third party, and 3) the third party's ability to assert his own interests is hindered. *Id.* at 410-11.

The Court's analysis in *Singleton v. Wulff*, 428 U.S. 106 (1976), guides our conclusion. In *Singleton*, two physicians challenged restrictions on government funding for abortions performed on patients eligible for Medicaid. The Court found that the physicians had stated an injury when they alleged that they would receive payments from the state for performing these abortions if the relief they sought were granted. 428 U.S. at 113. A plurality explained that the second condition is met when "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue" and when the litigant "is fully, or very nearly, as effective a proponent of the right as the latter." *Id.* at 114-15. As to the third condition, the Court did not demand that asserting a right be impossible for a third party but that a "genuine obstacle" to assertion exist. *Id*. at 116. Then, "the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." *Id*.

Applying these tests to the facts before us, we agree with the district court's analysis of third-party standing. The attorney-plaintiffs, like the physicians in *Singleton*, stand to lose income if the challenged statute remains in force. This constitutes an actual injury. The relationship between indigent defendants who seek appointed appellate counsel and attorneys whose appellate representation is denied is a close one . Judge Rogers's dissent in this case questions neither the existence of actual injury nor the closeness of the relationship between indigent defendants and appellate counsel. Rather, he would deny standing to the attorney-plaintiffs based on the third prong of the *Powers* requirements, that of significant obstacles to bringing suit to enforce one's own rights.

In *Singleton*, the Court recognized that a suit brought by the women was not an impossibility; for example, the pregnant women could file suit under pseudonyms to protect privacy. 428 U.S. at 117; *see also id.* at 116 n.6 (discussing potential routes around obstacles in earlier third-party standing cases). The Court, however, reasoned that third-party standing is permissible even where a prospective litigant may be able to bring suit, because a genuine obstacle is all that is necessary satisfy the third prong of the *Powers* requirements. *Id*. at 116. Yet, the dissent seeks to stretch this third prong from a showing of a hindrance to asserting one's own rights to a requirement of impossibility, a stretch the Court disavowed in *Singleton*.

Federal courts have permitted third-party standing frequently in the context of racially suspect peremptory challenges during jury selection, identifying as obstacles the procedural burdens prospective jurors face of having no chance to be heard at their exclusion or no real ability to obtain declaratory or injunctive relief at that time, as well as the practical burdens of economic costs and small financial gain. *See e.g. Powers*, 499 U.S. at 410-11; *United States v. Ovalle*, 136 F.3d 1092, 1102 (6th Cir. 1998). Privacy and anonymity concerns have also been noted as hindrances to individuals enforcing their rights. *Singleton*, 428 U.S. at 116; *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (discussing stigma that could deter mental health patients from pursuing litigation). While stigma is an unlikely hindrance to an indigent defendant asserting his right to counsel after pleading guilty, economic and procedural burdens are obstacles for convicted indigents.

An indigent seeking appointed counsel does not have the economic means to pursue a lawsuit to enforce his rights or appeal the denial of them. As the Court has noted, almost every layperson would need the help of counsel to present an appeal. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985). Indeed, in the similar state case upon which the dissent relies to show that an indigent was able to assert his rights, the indigent had appointed counsel. *Bulger*, 614 N.W.2d at 105. For reasons

unstated, the Michigan Supreme Court, after electing not to assert superintending control over Bulger's appeal on the merits, granted Bulger time to move for appointed appellate counsel. *Id*. The Michigan Supreme Court ordered the trial court to appoint counsel to argue the motion for appointed appellate counsel; thus, appointed counsel for this issue represented Bulger throughout his unsuccessful attempt to obtain appointed appellate counsel. *Id.* The Michigan Supreme Court apparently recognized that an indigent would have difficulty pursuing the right to counsel as a *pro se* plaintiff. The dissent speculates that the indigents would have no difficulty obtaining a lawyer to represent them, primarily evidenced by its unsupported assumption that if the attorney-plaintiffs have the wherewithal to bring suit as parties, they ought to be just as willing to represent the indigents.

An indigent defendant also faces procedural burdens, confronting a situation in which assertion of the right to counsel would be effectively precluded by events transpiring between his plea and the first time he could pursue the matter in federal court. Following a guilty plea, a defendant could move, as Bulger did, for appointment of counsel to prepare an application for leave to appeal. *See* 614 N.W.2d at 105. The defendant would lose in this proceeding, for Michigan will be bound by its precedent. The indigent would be unable to assert his right to appointed counsel in federal court because of, as the dissent correctly notes, abstention doctrines. Upon reaching the conclusion of his unassisted attempts to appeal on the merits, the indigent would then be unable to bring a constitutional challenge to lack of appointed counsel in federal court that would gain him relief in the form of appointed appellate counsel. As we recently held in *Dotson v. Wilkinson*, __ F.3d. __ (2003), a prisoner could raise a Section 1983 claim to vindicate due process rights if the suit "does not *necessarily* implicate the invalidity of his continued confinement." While *Dotson* involved parole procedures, we drew upon *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), for its holding that in a Section 1983 suit alleging unlawful investigation and arrest, Heck was actually testing the legality of his conviction despite seeking only damages. *Dotson*, ___

F.3d at ___ (citing *Heck*, 512 U.S. at 481-82).  Many courts would find that a Section 1983 action alleging that denial of appointed appellate counsel violated rights would similarly be a test of the underlying conviction.  In such a situation, the indigent would have to pursue a petition for habeas corpus, including a claim that the lack of appointed counsel prejudiced him, but only after exhausting state remedies. *See* 28 U.S.C. § 2254(b), (c).  Though an indigent could pursue a petition for habeas corpus on a ground such as involuntariness of his plea and perhaps invalidate his conviction as a result, the likelihood  he could ever obtain similar relief in a successful petition asserting his right to appointed appellate counsel is virtually impossible.  Even respecting principles of comity and federalism, we find that an indigent defendant would likely be foreclosed from any meaningful challenge to the lack of appointed counsel to prepare an application for leave to appeal.

The Supreme Court has, on at least two occasions, held that attorneys have third-party standing to assert constitutional rights of clients when a right to representation by counsel was affected by government action. *United States v. Triplett*, 494 U.S. 715, 720-21 (1990); *Caplin & Drysdale Chartered v. United States*, 491 U.S. 617, 623- 624 n.3 (1989).  In *Triplett*, the Court found third-party standing where Department of Labor regulations imposed restrictions on attorney's fees in black lung benefit cases, allowing an attorney to invoke the rights of black lung claimants because  the fee restriction deprived prospective clients of the right to obtain legal representation. 494 U.S. at 720.  The Court observed that it has found third-party standing when "enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship, to which relationship the third party has a legal entitlement (typically a constitutional entitlement)." *Id.*  Though this restriction was against the litigant, the Court did not limit its holding to this alignment of parties. *See id.*  Here, the statute does not restrict the attorneys or the indigents, but takes away the indigents' entitlement to appointed counsel, effectively placing the

restriction on the state by prohibiting it from providing counsel in certain cases.

In *Caplin & Drysdale*, the Court held that a law firm had third-party standing to challenge a criminal forfeiture statute that required its criminal client to relinquish all his assets, leaving nothing for payment of legal fees.  491 U.S. at 624 n.3.  The law firm contested the constitutionality of the statute as infringing upon defendants' Sixth Amendment right to counsel of choice. *Id.*  The dissent notes that the client in *Caplin & Drysdale* forfeited his property to obtain a plea agreement, and the plea-bargaining pressure to forgo the defense attorney's fee claims by relinquishing assets, according to the dissent, constitutes an obstacle of the type contemplated by *Powers*.  The indigents here faced the plea-bargaining process, and part of that process is informing them of the state's prohibition on appointed appellate counsel as a consequence.  If facing the choice of relinquishing assets to enter into a plea bargain or going to trial is an obstacle, then too is the similar choice of giving up appointed counsel as a result of a plea.

The dissent cites three cases in which courts refused to grant third-party standing to attorneys.  In the first, *Conn v. Gabbert*, 526 U.S. 286 (1999), an attorney representing a witness in the well-known murder trial of the Menendez brothers was searched by police for a letter sent from one brother to his client. *Id.* at 288.  At the same time, the witness was called to testify before the grand jury without the attorney present, because he was being searched. *Id.* at 289.  The attorney brought suit under Section 1983 to enforce his own right to practice law, and further argued the timing of the search interfered with his client's right to have him available for consultation. *Id.* at 292.  The Court declined to address whether his client had such a right, declaring he had no standing to enforce it; however, the Court did not discuss any of the factors required to obtain standing in making its conclusion. *Id.* at 292-93.

Illustrating its point that attorneys should not have third-party standing to challenge any statute that could affect their livelihood, the dissent refers to *Alexander v. Whitman*, 114 F.3d 1392, 1408-09 (3d Cir. 1997), for its holding that a law firm had no standing to challenge a statute forbidding wrongful death actions on behalf of stillborn fetuses. The suit arose when Alexander had a stillborn child and wished to bring a wrongful death action against the hospital and medical personnel, but was barred by the statute. *Id*. at 1396-97. Alexander brought her own challenge, in which the attorneys asserted their claims. The Third Circuit stated it was unaware of a constitutional right allowing the attorneys to sue "under the circumstances involved here" and affirmed the district court's conclusion that the mother was best suited to challenge the statute. *Id*. at 1409. In questioning the law firm's challenge to the denial of standing, the court preceded that observation by commenting that "whatever loss" the lawyers would suffer "is reduced to such insignificance (if not absurdity) by Ms. Alexander's tragic loss." *Id*. at 1410. The Third Circuit did not apply the facts of the case to the requirements articulated in Supreme Court standing precedent, appearing to dismiss the third-party claim as a meaningless extreme.

The third case is *Lambert v. Turner*, 525 F.2d 1101 (6th Cir. 1975) (per curiam), in which we rejected third-party standing for a legal services attorney to bring suit on behalf of all legal services attorneys against a state juvenile court judge for an injunction to prohibit the judge from failing to enforce rights of indigents to counsel and from retaliating against defendants represented by legal services. *Id*. at 1102. Our affirmance of the district court's decision, however, rested partly upon the fact that the parties entered into a consent injunction, thus eliminating any case or controversy between the parties. *Id*. Furthermore, the suit had named not one juvenile involved in an active case before the judge and sought to vindicate the rights of "potential juvenile clients." *Id*.

The prohibition against third-party standing would, in Judge Rogers's view, apply strongly where legal service providers wish to require procedures that increase demand for their services. The "paradigm case" he mentions, however, is a hypothetical situation the Court used to illustrate how, under the Administrative Procedure Act, 5 U.S.C. Section 702, a party seeking judicial review of a federal agency action must establish that his injury "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the basis of his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). In the Court's hypothetical, a legal transcription company would not be "adversely affected within the meaning" of a statute requiring an agency to conduct "on the record" hearings, because the statute was enacted to protect parties to the hearings. *Id*. The *Lujan* case involved not a constitutional right like access to counsel, but a complaint by an environmental group against the Department of the Interior and Bureau of Land Management for violations of environmental and public land management statutes in decisions to reclassify public lands or return them to public domain, thus opening the lands up to mining. *Id*. at 879. The example used happens to be a legal services provider, but bears little relation to the ultimate issue here, the ability of indigent criminal defendants to assert a constitutional right to counsel.

Inmate access to the legal system is an important right, one that has been recognized in cases enforcing the ability of prisoners to have access to law libraries and legal assistance. *See Lewis v. Casey*, 518 U.S. 343 (1996); *Wilson v. Iowa*, 636 F.2d 1166, 1167 (8th Cir. 1981) (stating that inmates acting as "jailhouse lawyers" have standing to contest official action that prevents them from assisting fellow inmates). In *Lewis*, the Court wrote: "When any inmate . . . shows that an actionable claim of [challenge to sentences or conditions of confinement] which he desired to bring has been lost or rejected, or that presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided," that inmate can show the state did not furnish adequate access to law libraries or legal assistance. 518 U.S.

at 356. In citing these cases, we point to the significance attached to the ability of inmates to pursue actionable claims, and reason that if pursuit of actionable claims is an important right of inmates, but a burden prevents such pursuit, then surely the burden qualifies as the type of hindrance significant enough to satisfy the third prong of the *Powers* test.

In their brief, the indigents and attorney-plaintiffs cite numerous cases to support their abstention argument in which federal district courts have rejected abstention where controlling state authority "makes submitting those same constitutional issues to a state forum futile." *W.P. v. Poritz*, 931 F. Supp. 1187, 1195 (D.N.J. 1996); *see also McKinstry v. Genessee County Circuit Judges*, 669 F. Supp. 801, 806-07 (E.D. Mich. 1987). While these district courts asserted jurisdiction by rejecting abstention, we believe the rationale behind their decision is pertinent to the third-party standing issue here. Asserting the constitutional issue here in Michigan's courts would appear to be a similarly futile exercise for the indigent, which does not decrease in difficulty once he or she exhausts state relief. We hold that significant obstacles of indigency and procedural processes challenge the indigents in contesting the statute, thus satisfying the third prong in analyzing third-party standing for the attorney-plaintiffs.

### Constitutionality of the Statute

A defendant who pleads guilty in Michigan state court must now seek leave for appeal from the state court of appeals, rather than having an appeal of right, as we have in the federal system. Under most circumstances, the Michigan statute at issue operates to deny indigent defendants appointed counsel to assist in the preparation of petitions for appeal.

The United States Supreme Court has expanded the right to counsel to allow appointed appellate counsel in certain circumstances. The judge-appellants are correct in stating that the Supreme Court has never held that a constitutional right to appointed counsel exists on all first appeals. The Court has yet to address the situation the statute presents, that of a

discretionary first appeal. In addressing the issue of the right to appointed appellate counsel, the Court has ruled on first appeals as of right and second, discretionary appeals, but not the discretionary first appeal at issue here. We are left to fill in this gap.

In *Douglas v. California*, 372 U.S. 353 (1963), the Court held that a California rule of criminal procedure was unconstitutional. The California rule mandated appellate court review of the trial record to see whether appointment of appellate counsel would be helpful to the court or to the indigent defendant making the request. The Court, without stating that it was specifically relying on due process or equal protection, reasoned that defendants who could afford counsel would have the advantage of briefs and argument prepared and delivered by counsel. *Id.* at 356. On the other hand,

> unless the printed pages show that an injustice has been committed, [indigent defendants are] forced to go without a champion on appeal. Any real chance [indigent defendants] may have had of showing that [the] appeal has hidden merit is deprived . . .when the court decides on an ex parte examination of the record that the assistance of counsel is not required.

*Id.* (emphasis omitted) To the Supreme Court, this procedure constituted impermissible discrimination against indigent defendants. *Id*. The Supreme Court held that if the state elected to create a system of appeals, a right to counsel exists for first-tier appeals as of right. *Id*. The Supreme Court expressly declined to address denial of counsel to assist an indigent in

> preparation of a petition for discretionary or mandatory review beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an appellate court. We are dealing only with the first appeal, granted as a matter of right to rich and poor alike.

*Id*. at 356 (emphasis omitted).

The Michigan judges here emphasize both that *Douglas* is limited to first appeals of right and that the language in the *Douglas* opinion places abstract limits on the need for equality. "[A] state can, consistently with the Fourteenth Amendment, provide for differences [in appellate procedure] so long as the result does not amount to a denial of due process or an 'invidious discrimination.' Absolute equality is not required; lines can be and are drawn and we often sustain them." *Id.* at 356-57 (citations omitted). The Michigan judges argue that this language supports their position that due process and equal protection do not require appointed appellate counsel in the present situation.

The Supreme Court further explained in *Douglas*, however, that "where the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor." *Id*. at 357 (emphasis omitted). It described the differences between an appeal of right in which a defendant who can afford counsel retains a lawyer and one in which an indigent is unrepresented. "The indigent, where the record is unclear or the errors are hidden, has only the right to a meaningless ritual, while the rich man has a meaningful appeal." *Id.* at 358.

Another case considering the right to appointed counsel on appeal is *Ross v. Moffitt*, 417 U.S. 600 (1974). The judge-appellants assert that the holding in *Ross* is controlling, as it addressed discretionary appeals. The criminal appellant in *Ross* was denied appointed counsel for a discretionary appeal to the North Carolina Supreme Court after the state court of appeals affirmed his trial conviction. *Id.* at 603-04. The Court held that the United States Constitution did not require appointment of counsel to assist in discretionary second-level appeals. *Id.* at 610.

Discussing its decision under a due process analysis, the Court reasoned that the role of an attorney is different in trial. There the attorney acts as a shield to protect a person presumed innocent. In appellate proceedings, the role is of

"a sword to upset the prior determination of guilt." *Id.* at 610-11. The Court stated that the existence of an appeal process does not require a state to provide counsel in every stage to be fair but cannot single out indigents and deny them "meaningful access to the appellate system because of their poverty." *Id*. at 611.

The disparate treatment of indigents, stated the Court, is more appropriately discussed under an equal protection analysis. The requirements of equal protection do not require exact equality, but do require that the appellate system be "free of unreasoned distinctions" and "that indigents have an adequate opportunity to present their claims fairly within the adversary system." *Id.* at 611-12 (citations omitted). The Court held that the Equal Protection Clause would not require the state to appoint counsel for discretionary second level appeals. *Id*. at 612.

Much of the Court's position, however, stems from the fact that North Carolina allowed an appeal of *right* to the state supreme court in cases involving a sentence of death or life imprisonment and to the state court of appeals in all other criminal cases. *See id.* at 613. North Carolina authorized appointment of counsel for this first appeal of right. *Id.* at 614. Thus, in petitioning for a discretionary appeal in North Carolina, a defendant has already had his claims presented by a lawyer and rejected by an intermediate appellate court. *Id.* He will then have materials such as trial transcripts, a brief on appeal, and often an appellate opinion. *Id* at 614-15. An appellate court weighing a discretionary petition for second appeal would have sufficient material to provide a basis for a decision to grant or deny an appeal. *Id.* at 615.

The Court also emphasized the purpose of the discretionary nature of the second appeal in *Ross*. The Court reasoned that higher appellate courts take cases of significant public interest, of major jurisprudential significance, or to resolve conflicts between their decisions and those of lower courts. *Id.* The higher appellate courts will have sufficient material to determine if this second-level, discretionary appeal is one

they should consider and may deny the appeal even if the intermediate court erred, because the case does not fulfill a function they serve by reviewing significant cases. *Id*. at 615.

The dissent in *Ross* agreed with the Fourth Circuit's decision in the case, declaring that a right to appointed counsel attached in discretionary appeals. *Ross*, 417 U.S. at 619 (Douglas, J., dissenting.) The Fourth Circuit had found "no logical basis for differentiation between appeals of right and permissive review procedures in the context of the Constitution and the right to counsel." *Id*. (citation omitted). The dissent argued that the Fourth Circuit was correct in noting that an indigent defendant proceeding without counsel is at a substantial disadvantage compared to a wealthier defendant who may hire counsel "when he is forced to fend for himself in seeking discretionary review from the State Supreme Court or from [the United States Supreme] Court." *Id*. at 620.

We have once before held that states may not deny appointment of counsel to assist indigent defendants in preparing applications for discretionary direct appeal to the state's highest court. *Mitchell v. Johnson*, 488 F.2d 349, 349 (6th Cir. 1973). Our decision was made before the Supreme Court ruled contrarily in *Ross v. Moffitt*. The reasoning, however, is instructive. There we looked at the Supreme Court's decision in *Douglas v. California*, as well as two other Supreme Court cases dealing with rights of indigents to assistance on appeal. In the first, *Griffin v. Illinois*, 351 U.S. 12 (1956), the Supreme Court ruled that an appellate review procedure that in effect required defendants to have access to a trial transcript would comport with due process and equal protection only if indigents were provided with a free transcript. Four of the justices stated, at 19,

> [T]o deny adequate review to the poor means that many of them may lose their life, liberty, or property because of unjust convictions which appellate courts would set aside. . . . There can be no equal justice where the kind of trial a man gets depends on the amount of money he

has. Destitute defendants must be afforded as adequate [an] appellate review as defendants who have money enough to buy transcripts.

Similarly, the Court held in *Burns v. Ohio*, 360 U.S. 252 (1959), that a state could not require an indigent to pay a filing fee as a condition to filing for leave to appeal to the state supreme court. The Court reasoned, at 257, that:

> [O]nce the State chooses to establish appellate review in criminal cases, it may not foreclose indigents from access to any phase of that procedure because of their poverty. . . . This principle is no less applicable where the State has afforded an indigent defendant access to the first phase of its appellate procedure but has effectively foreclosed access to the second phase of that procedure solely because of his indigency.

These cases point to a concern that no one be precluded from pursuing the avenues of appeal simply because one cannot afford the pursuit. That rationale was stated in *Mitchell*:

> [D]efendants without education in the law or experience in its practice cannot be expected, unaided, to state accurately and clearly whatever claims for justice their cases might possess. . . . [W]e think it not unreasonable to postulate that discretionary review will be denied indigents in a significant number of cases where wealthier appellants, with the assistance of counsel, would have obtained review and possibly a reversal of the conviction on the merits.

488 F.2d at 351. With only two significant Supreme Court cases that expressly address the right to appointed appellate counsel, the parties urge us to consider the right to such counsel as deduced from several habeas corpus cases that concern effective assistance of counsel. In *Evitts v. Lucey*, 469 U.S. 387, 396 (1985), the Court held that defendants were entitled to effective assistance of counsel on a first appeal of right. "To prosecute the appeal, a criminal appellant must

face an adversary proceeding that--like a trial--is governed by intricate rules that to a layperson would be hopelessly forbidding." *Id.*   The Court stressed that an appellate brief on the merits of the appeal, a trial transcript, and a lower court opinion are important in appellate cases.

In *Pennsylvania v. Finley*, 481 U.S. 551 (1987), a habeas corpus case that dealt with appointed counsel in the context of effective assistance, the Court reversed a Pennsylvania Superior Court's ruling that *Anders v. California*, 386 U.S. 738 (1967), controlled the conduct of appointed counsel in collateral post-conviction proceedings. *Finley*, 481 U.S. at 554.   Though *Anders* was based on the underlying right to appointed counsel in the first appeal of right, the Court held it applied only when the criminal defendant has established the right to counsel. *Finley*, at 554.   In *Finley*, the criminal defendant *was* afforded appointed counsel in her first direct appeal, which happened to be as of right, *id*. at 553,  but the Court determined she had no right to counsel in post-conviction proceedings and her appointed counsel need not have followed *Anders* when assisting with her collateral attack. *Id*. at 558.   The judge-appellants urge us to consider this case to bolster their argument that appointed appellate counsel is required only in an appeal of right.   We give little weight to their use of *Finley*, however, because it addresses the right to appointed appellate counsel only by repeating the principles stated in *Douglas* and *Ross*.

The Court found that the distinction between *Douglas* and *Ross* was significant in deciding *United States v. MacCollom*, 426 U.S. 317, 324 (1975) (plurality opinion*),* in which an indigent prisoner sought a free trial transcript to help him prepare a collateral attack under 28 U.S.C. § 2255.   The indigent had an opportunity for a direct appeal as of right.   He failed to pursue it, which would have allowed him to receive the free trial transcript. *Id*. at 325.   Thus he could not, years later, seek a free transcript for a collateral attack, which the Court characterized as "a delayed duplicate of a right of appeal with attendant free transcript which it offered in the first instance . . . ." *Id*. at 325-26.   MacCollom had already

been given "an adequate opportunity to present his claims fairly . . . ," which is all *Ross* required. *Id*. at 324 (quoting *Ross*, 417 U.S. at 616).

The indigents and attorney-appellees in the present appeal urge us to consider the Court's discussion in *Smith v. Robbins*, 528 U.S. 259, 276-78 (2000), of previous cases setting forth rights of indigents pursuing appellate review. *Smith* involved the constitutionality of a California procedure that allowed counsel to withdraw when faced with the possibility of pursuing a frivolous appeal. *Id*.   The Court reiterated that the guarantees of the Equal Protection and Due Process Clauses combine to require that a state's appellate process provides indigents adequate opportunity to present claims, but did not make a distinction between appeals of right and discretionary appeals. *Id*.

We cannot read into this discussion any mandate from the Court for states to provide appellate counsel in every instance. What we can take from the discussion is that appellate processes must be fair and may not be implemented in a manner that discriminates based on indigency.   The judge-appellants argue that the manner in which the process for appeal has been implemented in Michigan does not discriminate based on income or deny fair opportunities to indigents.

The judge-appellants emphasize the distinction between convictions following trials and convictions based on pleas. The Court declared in *Hill v. Lockhart*, 474 U.S. 52, 58 (1985) (quoting *United States v. Timmereck*, 441 U.S. 780, 784 (1979)), that the state has a fundamental  interest in the finality of the prosecution following entry of a plea.   The Michigan judges argue that judges must follow statutory procedures to ensure that a defendant's rights are protected when he chooses to enter a plea and that he makes the plea knowingly, voluntarily, and truthfully.   This is not an infallible procedure, though.   An appellate court may find error, as we frequently find in appeals from guilty pleas in federal district courts.   Under Michigan law, a plea of guilty

or nolo contendre waives issues that could have been raised on appeal, such as search and seizure claims or Fifth Amendment claims. M.C.R. 6.311(C). A guilty plea does not foreclose a defendant from raising other issues, such as double jeopardy claims or jurisdictional claims. These issues, we note, are legally complex to a layperson. *Bulger*, 614 N.W.2d at 138 (Cavanaugh, J., dissenting).

The argument that a guilty plea bars defendants from raising some issues and that the plea process protects rights also would not apply to defendants who hope to raise discrepancies in sentencing. While limited exceptions allow for the courts to appoint appellate counsel following a guilty plea, such as when courts have imposed sentences that exceed the upper limit of the guideline range, these exceptions are infrequent. Conditional pleas are not regularly entered, and a defendant who was sentenced within the limits for a mandatory minimum sentence will have no absolute right to appointed counsel to prepare an application to appeal.

Finally, the judge-appellants argue that indigents who plead guilty have an adequate opportunity to preserve issues for appeal and present challenges through post-conviction trial court motions that appointed trial attorneys file. The indigents and attorney-plaintiffs noted that these motions, however, are not the same as an appeal to the next highest court, but are usually of the type seeking withdrawal of appointed trial counsel, a new trial, or a rehearing.

Review of criminal procedures in other states indicates that few states require an application or petition for leave to appeal for the first appeal from a conviction, whether plea-based or verdict-based. *See Bundy v. Wilson*, 815 F.2d 125, 136-142 .(1st Cir. 1987) (collecting all state statutes pertinent to right to appeal). Of the other states that mandate a petition or request for appeal from criminal proceedings, being New Hampshire, Virginia, and West Virginia, none regulate

appointment of appellate counsel in the manner prescribed by Michigan law.[2]

Michigan's statute creates unequal access even to the first part of the appellate system. Though the judge-appellants argue that any distinctions in Michigan's appellate system stem from the fact the indigent pleads guilty, or that the appeal is merely discretionary, the effect is to create a different opportunity for access to the appellate system based upon indigency. As applied, the statute violates the due process provision of the Fourteenth Amendment to the United States Constitution, and is thus unconstitutional.

### Reach of the Injunction

After issuing its opinion in the first case, the district court then crafted an injunction that not only bound parties to the original action, but also parties in the second action, Judge Kolenda, and other non-parties.

On appeal, the standard of review for the grant of an injunction is abuse of discretion. *United States v. Miami Univ.*, 294 F.3d 797, 806 (6th Cir. 2002). "A district court

---

[2]In New Hampshire, a defendant convicted of a class A misdemeanor has a right to appeal to the superior court from a conviction in municipal or district court. N.H. Rev. Stat. Ann. §599.1 The state supreme court may decline to accept an appeal from a lower court. N.H. R. of Ct. 7. The New Hampshire constitution guarantees counsel to assist defendants who will have liberty deprived, N.H. Const. Pt. I, art. 15, but in cases where liberty is not at stake, neither trial counsel nor appellate counsel need be appointed. *State v. Westover*, 666 A.2d 1344, 1347 (N.H. 1995).

In Virginia, appeals to the court of appeals or supreme court are discretionary, except for appeals of capital convictions. *Dodson v. Dep't of Corrections*, 355 S.E.2d 573, 576 n.5 (Va. 1987). Virginia Code §19.2-157 provides that an indigent is entitled to appointed appellate counsel. *Id.* at 309, 355 S.E.2d at 577.

In West Virginia, the state constitution establishes initial appeal by petition. *Billotti v. Dodrill*, 394 S.E.2d 32, 37-38 (W.Va. 1990). The West Virginia Supreme Court determined that an indigent must be allowed appointed counsel to assist on appeal. *Id.* at 39; *Rhodes v. Leverette*, 239 S.E.2d 136,139 (W.Va. 1977).

abuses its discretion when it relies on clearly erroneous findings of fact or when it improperly applies the law." *Id.* (quoting *Herman Miller, Inc. v. Palazzetti Imports & Exports*, 270 F.3d 298, 308 (6th Cir. 2001)).

Under Section 1983, injunctive relief cannot be granted against a judicial officer "unless a declaratory decree was violated or declaratory relief was unavailable." Following the March 30, 2000, hearing, the district court issued an opinion declaring the statute and the practice unconstitutional.

Under the declaratory judgment statute, 28 U.S.C. § 2201(a), a court "may declare the rights and other legal relations of any interested party seeking such declaration." Declaratory judgment is effective as to only the plaintiffs who obtained it. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931 (1975). When a class has not been certified, the only interests of concern are those of the named plaintiffs. *McKenzie v. Chicago*, 118 F.3d 552, 555 (7th Cir. 1997). The Court of Appeals for the Seventh Circuit explained, "A wrong done to plaintiff in the past does not authorize prospective, class-wide relief unless a class has been certified." *Id.* The Court of Appeals for the Third Circuit has ruled that a declaratory judgment finding a state statute unconstitutional is binding only upon parties named in the action. *YWCA of Princeton v. Kugler*, 463 F.2d 203, 204 (3rd Cir. 1972). We have already determined that abstention principles keep federal courts from ruling upon the cases of the indigent plaintiffs so only the attorneys would be protected by the declaration as named plaintiffs. A different attorney, neither Fitzgerald nor Vogler, seeking court appointment to handle a defendant's application for appeal, or a future indigent defendant, has not had his or her interests declared under the district court's order. Thus, under *Doran* and authority from sister circuits, we hold that the declaration and injunction applies only insofar as it states the rights of the named attorney-plaintiffs.

The district court stated that it was exercising its authority to issue an injunction against the judges under Federal Rule of Civil Procedure 65(d). The rule provides:

Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail . . . the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

To prevail on a motion for preliminary injunction, a plaintiff must show the following elements: 1) likelihood of success on the merits, 2) irreparable injury, 3) degree of harm an injunction would cause to others, and 4) that the public interest would be served. *Doran*, 422 U.S. at 931; *Local Union 1837 v. Norfolk S. Corp.*, 927 F.2d 900, 904 (6th Cir. 1991). To receive final injunctive relief, a plaintiff must prevail on the merits of the claim, show irreparable injury, and show that he has no adequate remedy at law, and the court must consider the effect on the public good. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

A lack of irreparable injury must end the court's inquiry. *Aluminum Workers Int'l Union v. Consol. Aluminum Corp.*, 696 F.2d 437, 444 (6th Cir. 1982). The record does not show whether the district court found irreparable injury, and the district court did not address it in either of its two opinions. The judge-appellants argue that none of the plaintiffs can show irreparable injury. They point out that the indigent criminal defendants were not subject to the statute, nor do they have pending charges that will subject them to the statute. The attorneys are a different case. The judge-appellants allege that the attorneys will suffer only transitory harm by being denied appointments, and that no evidence shows the attorneys would even receive future appointments. The attorneys argue, however, that without injunctive relief it is entirely likely that this aspect of their practice, however small or large in volume, would be eliminated. The attorneys would be forced to challenge each denial of appointment.

Our deepest concern with the equitable relief fashioned by the district court is that it enjoins non-party judicial officers. During the June 30, 2000, hearing, the district court expressed concern with the propriety of enjoining all Michigan circuit court judges, and rightly so. We have often reiterated the principle that injunctive relief should be no broader than necessary to remedy the harm at issue. *See, e.g., Miami Univ.*, 294 F.3d at 816 (6th Cir. 2002). In *Blackard v. Memphis Area Medical Center for Women, Inc.*, 262 F.3d 568 (6th Cir. 2001), we explained that Federal Rule of Civil Procedure 65(d) is based on the doctrine that "a decree of injunction not only binds the parties defendant but also those represented by them or subject to their control." *Id.* at 574 (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).

To determine whether a person is in active concert or participation with an enjoined party, we look to the actual relationship between the two. *Id.* Control of a third party by the enjoined party is not a requirement for the third party to be bound. *Id.* The third party is bound "if that party is identified with the named, enjoined party in interest, in 'privity' with it, represented by it or subject to its control." *Id.* In this case, the judges named in the original suit, who would be bound by an injunction issued for violating the decree, are not in control of or in privity with the other state judges, including Judge Kolenda. The only way in which these judges could conceivably be identified in interest is that they all happen to be judges and have sworn to uphold Michigan law. We think this to be a far broader application of the concept of "active concert and participation" than permissible under the district court's authority.

Enjoining a judge is a serious matter. As we stated in *Panhandle Eastern Pipe Line Co. v. Thornton*, 267 F.2d 459, 460 (6th Cir. 1959) (citations omitted), an injunction against a judge is a "drastic and extraordinary remed[y]" that is "reserved for really extraordinary causes." As a sister circuit asked, in adopting the reasoning of a former dissenter: "When we embark on this new course, we must prepare to

face this unpleasant question: If a state judge does not obey a district court's injunction, are we willing to jail the state judge for contempt?" *Pompey v. Broward County*, 95 F.3d 1543, 1550 (11th Cir. 1996) (quoting *Luckey v. Harris*, 896 F.2d 479, 482 (11th Cir. 1989) (Edmonson, J., dissenting)). In some circumstances, enjoining a judge is necessary to ensure full relief to the parties. *In Re Justices of the Supreme Court of P. R.*, 695 F.2d 17, 23 (1st Cir. 1982). For example, in *WXYZ, Inc. v. Hand*, 658 F.2d 420 (6th Cir. 1981), we upheld a district court's injunction against a state judge who had issued an unconstitutional media suppression order.

Engaging in unconstitutional practices or following an unconstitutional statute are circumstances that may warrant injunctive relief. The injunctive relief cannot be unlimited, however, and must comport with established rules of civil procedure. Even the district court recognized that it was treading on uncertain ground, indicating that it was "mindful that the issue of whether an injunction can issue with respect to those judicial officers not parties to the prior declaratory decree is not clear cut." 114 F. Supp. 2d at 628. After parsing the language of Section 1983, the court concluded that the specification of "a" declaratory decree, rather than expressly requiring one for each judicial officer, indicates a congressional intent to allow one declaratory decree to apply to multiple enjoinees. *Id.* The court added that this interpretation promotes conservation of judicial resources by not requiring plaintiffs to file suit each time a judge acts contrarily to the decree.

The district court commented that the scarcity of cases addressing the issues set forth in the indigents' and attorney-plaintiffs' motion for an injunction suggests that the overwhelming majority of judges do abide by federal court orders that are designed to enforce the United States Constitution. *Id.* at 629. "Indeed, it is ordinarily presumed that judges will comply with a declaration of a statute's unconstitutionality without further compulsion." *In re Justices of Supreme Court*, 695 F.2d at 23. Failure of a judge unnamed in a declaratory decree to abide by such declaration

does not allow a district court to throw caution to the wind and summarily bind all judges. The court must still follow the statutes, rules, and case law governing the issuance of injunctions. We hold that with respect to Judge Kolenda, a non-party to the original suit, and to the unnamed and uncertified putative class of Michigan judges, the injunction cannot issue.

A further defect with the injunction is that no separate document was entered for the decree or injunction. Rule 58 of the Federal Rules of Civil Procedure requires that "[e]very judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)." Federal Rule of Civil procedure 79(a) governs the procedures the clerk must use when entering judgments. In *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 384, *reh'g denied,* 436 U.S. 915 (1978), the Supreme Court explained the existence of Rule 58 as a necessity to provide a means to determine deadlines to appeal. Though the rule is to be applied mechanically to determine whether an appeal is timely, it should not foreclose appellate jurisdiction and may be waived where district courts show intent that the opinion and order be the final judgment, judgment is entered in the docket, and parties do not object to the lack of a separate judgment. *Id.* at 387. We have held that the lack of a separate document under Rule 58 divests us of jurisdiction to hear an appeal. *See*, *e.g.*, *Communications Workers of Am. v. United Tel. Co.*, 491 F.2d 207 (6th Cir. 1974). The outcome of these cases required remand to the district court for entry of a separate judgment, and then a new appeal. *See id.* Other circuits have held that the failure to enter a Rule 58 judgment, if a district court's decision is unquestionably final, does not prohibit appellate review. *See e.g. Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1272 n.3 (10th Cir. 1989) (citations omitted). We agree with the view of the Supreme Court and other circuits and hold that remand to the district court, after we have heard the merits of the case twice, would contravene judicial economy and require duplicative litigation. Therefore, we simply REVERSE the issuance of

the injunction against Judge Kolenda and all Michigan judges who were not parties to the original suit.

### III.   CONCLUSION

In conclusion, we AFFIRM the district court's ruling that it must abstain from hearing Tesmer's claims, that the attorneys have third-party-standing, and that the Michigan statute is unconstitutional. We REVERSE the district court's ruling that it may hear the claims of Schnell and Carter, and that it may issue an injunction against Judge Kolenda and non-party Michigan judges.

## CONCURRING IN PART, DISSENTING IN PART

ROGERS, Circuit Judge, concurring in part and dissenting in part.  With great respect, I feel bound to dissent on the ground that the lawyer plaintiffs in this case lack standing.  I concur in that portion of the majority opinion holding that under the principles of *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny, the district court was required to abstain with respect to the claims brought by the state criminal defendants.  Permitting lawyers in their own right to raise the same claims that *Younger* teaches cannot be brought by their clients undermines the very deference to state court processes required by *Younger*.  Time-honored prudential rules against third-party standing do not generally permit lawyers as parties to litigate the interests of their clients, and exceptions to the third-party standing rule should not be expanded to provide a tool to circumvent the policies underlying *Younger*.

## I. The General Prudential Rule Against Third-Party Standing

Numerous Supreme Court holdings support the unexceptional conclusion that a litigant must assert his legal rights or interests and cannot rely on the legal rights or interests of others not party to the proceedings.  In *Warth v. Seldin*, for instance, the Court stated the general rule that

> even when the plaintiff has alleged injury sufficient to meet the "case or controversy" requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.  Without such limitations closely related to Art. III concerns but essentially matters of judicial self-governance the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.

422 U.S. 490, 499-500 (1975) (citations omitted); *see also Powers v. Ohio*, 499 U.S. 400, 410 (1991); *United States Dep't. of Labor v. Triplett*, 494 U.S. 715, 720 (1990); *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 954 (1984); *Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982); *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 100 (1979); *Barrows v. Jackson*, 346 U.S. 249, 255 (1953).

The *Warth* case involved a challenge to ordinance provisions of the township of Penfield that allegedly kept low-income persons from moving to Penfield, contrary to the requirements of the Fourteenth Amendment.  *Warth*, 422 U.S. at 493.  Several classes of plaintiffs failed to show sufficiently that they would benefit from winning the suit, and thus lacked Article III standing.  *Id*. at 502-08, 514-17.  Two classes of plaintiffs, however, were held to lack standing even though they could or might be able to show Article III injury.  Taxpayers of nearby Rochester claimed that their tax burden would be increased by Penfield's refusal to share in the housing of poor people, and thus had Article III standing. 422 U.S. at 508-09.  The Court nonetheless found they lacked prudential standing since the Fourteenth Amendment basis for the Rochester taxpayers' suit, assuming the claim had validity, protected poor people who wanted to live in Penfield, but not taxpayers of neighboring jurisdictions.  *Id*. at 509-10.  Since the legal foundation of the lawsuit did not protect the interests of the Rochester taxpayers, those taxpayers lacked standing.  *Id*.

A second class of *Warth* plaintiffs, current residents of Penfield, also had a potentially sufficient interest to meet Article III standing requirements—the interest in living in a diverse community.  *Id*. at 512, 514.  But these plaintiffs lacked prudential standing because, again, the basis for the

lawsuit—the 14th Amendment—did not protect such an interest.  *Id*. at 514.  The Court contrasted the situation presented in *Warth* with cases that arose under Civil Rights statutes that did protect such interests.  *Id*.

The *Warth* holdings reflect a long-recognized principle.  In *Tileston v. Ullman*, 318 U.S. 44 (1943), the Supreme Court held that doctor plaintiffs lacked standing to challenge a Connecticut statute forbidding their counseling the use of contraceptives, where the sole interest asserted was the patients' right to life under the Fourteenth Amendment.  *Id*. at 46.  It should be noted that the Supreme Court in its analysis did not purport to engage in a balancing of interests.  Instead, it relied upon a general rule that plaintiffs must litigate their own interests, and that they lack standing to litigate the interests of others.  *Id*.

*Warth*'s holding with respect to third party standing is still good law, and was applied recently by the Supreme Court to a case involving a lawyer seeking as a party to litigate his client's interest.  *Conn v. Gabbert*, 526 U.S. 286 (1999).  In *Conn*, the Court rejected third party standing for an attorney who brought suit in his own right against a prosecutor for actions that interfered with the asserted right of his client, a grand jury witness, to have her lawyer available for consultation outside the grand jury room.  526 U.S. at 292-93.

The third party standing prohibition would appear to apply most strongly where a provider of legal services seeks to require procedures that will increase the demand for the provider's services.  Thus in the context of judicial review of administrative action (where prudential standing rules are, if anything, more loosely applied[1]), the Supreme Court has used

---

[1]Although the present appeal is not an Administrative Procedure Act (APA) case, because there is no federal administrative action being reviewed, any indication in an APA case that prudential standing requirements are *not met* would apply *a fortiori* to standing outside of the APA context.  This is because the Supreme Court has held (however mysteriously as a matter of textual analysis) that the APA expanded the

*as a paradigm case* the example of a transcript preparer who would lack standing to challenge an agency's refusal to require its hearings to be on the record as required by statute.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *see also NCUA v. First Nat'l & Trust Co.*, 522 U.S. 479, 498 (1998).

Plaintiff lawyers in this case are injured by a state rule that, if unconstitutional, is unconstitutional because it infringes on the interests of their unnamed future clients.  Application of the general rule requires the conclusion that they lack standing.  Moreover, the policies of the general rule apply squarely.  Permitting the lawyers to sue would permit the federal courts to "decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."  *Warth*, 422 U.S. at 500.

Congress may of course lift the prudential rule, permitting categories of persons with Article III standing to litigate the interests of others.  *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 162-66 (1997); *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 476-77 (1940).  No such statutory lifting of prudential standing requirements has been asserted in this case.

## II.   Exceptions to the General Rule

To be sure, the Court has found exceptions to the prudential rule.  First, where an enforcement action is brought directly

---

class of "aggrieved" persons entitled to judicial review.  *Ass'n of Data Processors v. Camp*, 397 U.S. 150, 157 (1970).  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) ("We have long since rejected [the] interpretation . . . which would have made the judicial review provision of the APA no more than a restatement of pre-existing law.  Rather we have said that to be 'adversely affected or aggrieved . . . within the meaning' of a statute, the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis of his complaint.").

against a defendant under a law or practice that the defendant argues is an invalid infringement of someone else's rights, the Court has engaged in a balancing determination to determine whether third-party standing should be permitted. In rejecting third-party standing for the Rochester taxpayers in *Warth*, the Supreme Court explicitly distinguished this category of cases:

> In several cases, this Court has allowed standing to litigate the rights of third parties when *enforcement of the challenged restriction against the litigant* would result indirectly in the violation of third parties' rights. *See, e.g., Doe v. Bolton*, 410 U.S. 179, 188 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965); *Barrows v. Jackson*, 346 U.S. 249 (1953). But the taxpayer-petitioners are not themselves subject to Penfield's zoning practices.

422 U.S. at 510 (emphasis added). This exception explains several of the cases relied upon by the majority to support third-party standing in this case, including *Powers v. Ohio, supra*. *Powers* involved a criminal defendant challenging *his conviction* by asserting the rights of a third party. 499 U.S. at 410. *See also Eisenstadt v. Baird*, 405 U.S. 438 (1972) (same); *Caplin & Drysdale v. United States*, 491 U.S. 617 (989) (criminal forfeiture of assets claimed by plaintiff lawyers); *Dep't of Labor v. Triplett*, 494 U.S. 715 (state disciplinary action against lawyer for accepting legal fees not permitted by federal regulation).[2] Similarly, where a plaintiff

---

[2] *Triplett*, relied upon by plaintiffs to support third-party standing in this case, is not only distinguishable because it was a direct enforcement against the party invoking the rights of others, but also because it involved United States Supreme Court direct review of a state high court judgment (in that case West Virginia). While the Supreme Court did not go so far as to hold that third-party standing limits are totally irrelevant in that context, *see* 494 U.S. at 721 n. **, it is nonetheless apparent that standing requirements may be less strictly enforced when the Supreme Court is reviewing a state court case than when it is ruling on standing in the lower federal courts. "Federal justiciability requirements, whether dictated by Article III or suggested by policy, all arise out of institutional concerns peculiar to the federal judiciary and its special role and are therefore

sues to enjoin such enforcement by criminal or regulatory authorities *against the plaintiff*, the court is more likely to find third-party standing. *See, e.g., Craig v. Boren*, 429 U.S. 190, 192-97 (1976) (vendor's challenge to enforcement of statutory prohibition *against vendor* of sale of 3.2% beer to males between 18 and 21 years of age); *Doe v. Bolton*, 410 U.S. 179, 188 (1973).[3]

---

irrelevant to the question of what more generous justiciability rules a state may adopt if it chooses to do so." 1 Laurence Tribe, AMERICAN CONSTITUTIONAL LAW 320-21 (3d ed. 2000) (footnotes omitted). A leading constitutional law casebook states:

> Standing, mootness, and ripeness rules apply both to constitutional litigation arising in the federal courts, and to Supreme Court review of constitutional decisions of state courts. The rules are sometimes different, however, depending on whether the Supreme Court is reviewing a state or federal court decision. One traditional explanation for the difference is that case or controversy limitations represent, in part, rules of self-limitation for the federal courts and as such are irrelevant to Supreme Court review of state decisions.

William Cohen & Jonathan Varat, CONSTITUTIONAL LAW 110 (10th ed. 1997). It follows that a expansive holding regarding prudential standing on review of a state high court, as in *Triplett*, does not necessarily control cases brought in the lower federal courts.

[3] Another case relied upon by the majority in this case, *Singleton v. Wulff*, 428 U.S. 106, 113-18 (1976), does not require an expansion of this exception. *Singleton* involved a challenge to Medicaid rules that limited reimbursement for the performance of abortions. A plurality of four Justices upheld third-party standing on the part of the doctor-plaintiffs challenging the Medicaid rules, and the opinion is arguably inconsistent with limiting third-party standing to direct enforcement situations. 428 U.S. at 113-18. Four Justices dissented vigorously in that case, however, on just that ground. *Id.* at 127-31 (Powell, J., dissenting). Justice Stevens' fifth vote was based on his finding that the doctors were litigating their own constitutional rights, and thus Justice Stevens took no position on the direct-vs.-indirect criterion for third-party standing in the presence of such a finding. *Id.* at 121-22. *Singleton* is thus not controlling on that issue, and the Supreme Court's reliance on the distinction in *Warth* remains good law.

Second, when litigation already has a plaintiff with standing, the presence of other injured parties does not undermine the purposes of the limitation on third-party standing, and has sometimes been allowed. In *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), for example, the Court reasoned that when there was at least one individual plaintiff who demonstrated standing to assert his own rights, it was unnecessary for the Court to decide if the circumstances justified departure from the general prudential rule against third-party standing and proceeded to the merits of the case. *Id*. at 263-64. *See also Doe v. Bolton*, 410 U.S. at 188.

Finally, the Supreme Court has explicitly found third-party standing requirements to be more liberally applied in First Amendment cases. *See, e.g., Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)[4]; *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38 (1999); *Eisenstadt*, 405 U.S. at 445 n.5; *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940). This relaxation of the rules of standing is the result of a concern that the application of those rules could have an "intolerable, inhibitory effect on the freedom of speech." *Eisenstadt*, 405 U.S. at 445 n.5. Relaxation of third-party standing requirements when the statute involved could suppress constitutionally protected speech is thus the logical extension of First Amendment overbreadth doctrine. *See Gooding v. Wilson*, 405 U.S. 518, 520-21 (1972).

This case involves none of special circumstances that allow for exceptions to the general prudential rule against third-party standing. First, this is not a case where the lawyers are being prosecuted, or even a case in which they assert the right to do something without being prosecuted or disciplined. Second, this is not a case where there is already a party who

seeks to vindicate his own interest, thus obviating the need to determine if third-party standing exists. Indeed, the majority holds that the district court should properly have refrained from hearing the claims of the state criminal defendants whose legal rights and interests are directly involved in this case, as a matter of federal deference to state processes. Finally, this is not a case in which the freedom of speech might be chilled by application of the third-party standing requirements.

Outside of these contexts, the Supreme Court has been firm in not permitting litigants to sue in federal court to vindicate the rights of others. *See Warth, supra*; *Air Courier Conference v. Am. Postal Workers Union*, 498 U.S. 517, 530 (1991). These cases have refrained from recognizing standing even where the plaintiffs' claimed injury was in not being able to profit from contracts with persons whose rights were protected by the law relied upon by the plaintiffs. Thus in *Air Courier Conference*, postal employee unions challenged a U.S. Postal Service regulation permitting private couriers to employ overnight delivery of letters to foreign countries as an exception to the statutes that generally provide for a Postal Service monopoly. The Supreme Court held that the postal monopoly statutes were not passed to protect postal employees or their unions, and that the unions accordingly lacked prudential standing.[5] 498 U.S. at 524-29. The Court reached this conclusion despite the clear contractual relationship between the unions and the Postal Service, as reflected in the labor-management provisions of the Postal Reorganization Act, provisions that the union plaintiffs relied upon to assert prudential standing. The Supreme Court rejected the argument:

> It would be a substantial extension of our holdings . . . to allow the Unions in this case to leapfrog from their

---

[4]The *Joseph H. Munson Co.* case, relied upon by plaintiffs to support lawyer standing in this case, is thus distinguishable as a First Amendment case. The case is also distinguishable as one that arose in state rather than federal court. See n. 2, *supra*.

[5]More specifically, the Court held that the unions were not within the "zone of interests" of the postal monopoly statutes under the APA. As explained in footnote 1 above, it follows *a fortiori* that the unions would lack prudential standing if the APA were not applicable.

asserted protection under the labor-management provisions of the PRA to their claim on the merits under the [postal monopoly statutes]. We decline to make that extension . . . .

498 U.S. at 530.[6]

The Supreme Court's holdings, outside of the exceptional contexts, thus require us to find that the lawyers in this case lack standing to litigate the interests of their future unascertained clients. It would be a short step from the majority's grant of third-party standing in this case to a holding that lawyers generally have standing to bring in court the claims of future unascertained clients. In many circumstances a lawyer could demonstrate Article III injury in fact with regard to such claims. For instance, a workers compensation attorney could show that the attorney's livelihood will be adversely affected by the implementation of a new regulation curtailing workers compensation benefits. An attorney who specializes in medical malpractice plaintiffs' cases could show that the attorney's livelihood will be adversely affected by a tort reform statute. An attorney who specializes in Social Security cases could show that a nonspeculative reduction in the attorney's income would result from the implementation of a new Social Security regulation. In each of these cases it would be anomalous for the attorney to be able to bring suit to challenge the statute or regulation, instead of a person protected by the constitutional provision or law asserted as the basis for the challenge—the injured worker, the medical malpractice plaintiff, or the Social Security claimant. Of course it may be harder for such a person to bring suit than for a lawyer to bring suit, since

---

[6]Similarly, though there must be innumerable business persons who would suffer injury in fact from a contract partner's loss of a tax dispute, Justice Stewart has pithily opined that he "cannot now imagine a case, at least outside the First Amendment area, where a person whose own tax liability was not affected ever could have standing to litigate the federal tax liability of someone else." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 46 (1976) (Stewart, J., concurring).

lawyers are often better off than their potential clients, and they are after all lawyers. But it still can't be that lawyers would generally have standing in such situations. *See Alexander v. Whitman*, 114 F.3d 1392, 1408-09 (3d Cir. 1997) (holding that attorney and law firm lacked prudential standing to challenge a state statute which provided that a wrongful death action could only be brought on behalf of a fetus if the fetus was born alive, and noting that "we can not help but wonder how the [lawyer and law firm] plaintiffs can seriously challenge the district court's ruling as to their lack of standing.") *Cf. Lambert v. Turner*, 525 F.2d 1101, 1102-03 (6th Cir. 1975) (holding that Legal Services attorney lacked standing to challenge state court judge's alleged retaliation against clients represented by Legal Services for using legal services; relying upon Article III and *Younger* comity).

## III. The Three-Part Test Used in Exceptional Contexts

Even in the contexts where the Supreme Court has been liberal in finding third-party standing, it has used a three-part test to determine whether third-party standing is permitted. Plaintiffs argue, based on the applications of that test in the specialized circumstances contexts listed previously, that the test should be liberally applied outside of those contexts to a case where a lawyer's alleged injury is simply that he will lose business if the government is not required to give his future clients the means to hire him. Even though some of those cases permitted lawyers as parties to seek to vindicate the interests of non-party clients, they can only be reconciled with the more general rule against third-party standing if one recognizes that the standards are different in the identified contexts.

Assuming that this case falls in some new exceptional category, which it does not appear to do, the lawyer plaintiffs fail the three-part test used in those contexts. This test, formulated by the Supreme Court in *Powers*, 499 U.S. 400, permits a litigant to bring suit on behalf of a third party if: 1) the litigant has suffered an injury in fact, 2) the litigant has a close relationship to the third party, and 3) there is some

hindrance to the third party's ability to protect his own interests. *Id*. at 410-11.

The first "prong" is but a restatement of the requirement of Article III standing and thus adds little to resolving whether a plaintiff who has Article III standing also has prudential standing. I agree with the majority that the lawyers in this case have adequately shown injury in fact because of the potential fees they will receive if successful on the merits. It is also reasonable to assume that the interests of the lawyers coincide with those of their future clients so that there is a sufficiently "close" relationship to the third party for purposes of the second prong of the analysis.

It appears, however, that the third prong of the test is clearly and classically not met in this case. That is, there is no hurdle to a criminal defendant who has plea bargained, and who has not been provided state-funded counsel on appeal, to challenge the lack of state-funded counsel. Not only is there no "chill," *Singleton*, 428 U.S. at 117, but—as recognized by the majority—an indigent plea-bargaining Michigan criminal defendant has already asserted his legal rights and interests in the Michigan courts, taken his case to the Michigan Supreme Court, and petitioned the U.S. Supreme Court on the merits, albeit unsuccessfully. *People v. Bulger*, 614 N.W.2d 103 (Mich.), *cert. denied*, 531 U.S. 994 (2000). No such alternative route was likely to be used, much less already used to raise the identical claim, in those cases where the Supreme Court relied on the third prong of its test to uphold third-party standing.[7] It is thus clear that comparable third parties in this case *can* assert their own rights, only not in the lower federal

---

[7]In my view, the fact that counsel was appointed in *Bulger* strengthens rather than weakens the point that a viable alternative route exists to bring up the issue. The potential future difficulty of obtaining appointed counsel to raise a subsequent challenge in the state courts, where that difficulty results from a square holding of the Michigan Supreme Court on the asserted constitutional claim, does not imply the absence of a route for a plaintiff with standing ever to raise the constitutional issue in the first place.

courts while state proceedings are underway, and the only obstacle to the assertion of their rights in the federal courts is the abstention doctrine.[8] Equating the abstention doctrine, a legal principle of comity, with the "genuine obstacle" of *Singleton* and *Powers* deeply undermines the policies underlying both abstention and prudential standing.

Plaintiff lawyers in this case cannot argue that indigent state defendants who have plea bargained are not able to raise the appointment-of-appellate-counsel issue in the state courts, since a state appeal has already been taken. Moreover, according to the majority, indigent state defendants who have plea bargained can also raise the appointment-of-appellate-counsel issue in the lower federal courts, if they wait until state criminal proceedings are concluded. *Ante* at 10. The only hindrance to indigent state defendants raising the appointment-of-appellate-counsel issue is the *Younger* principle that precludes interference with ongoing state proceedings.

This is very much unlike the situation in *Caplin & Drysdale v. United States*, 491 U.S. 617 (1989), relied upon by plaintiffs to support lawyer standing. The *Caplin & Drysdale* Court, in a footnote, upheld third party standing for a law firm suing to get a share of its client's assets that had been seized under criminal forfeiture laws, where the law firm relied on asserted Fifth and Sixth Amendment rights of its clients. 491 U.S. at 624 n.3. The client in order to obtain a plea agreement had agreed to forfeit all of his property to the government, leaving nothing to the lawyers. 491 U.S. at 621. In such cases the very clients whose interest is being asserted by the lawyers are subject to plea-bargaining pressure to forgo the lawyer's claims, which the clients have no interest in

---

[8]While it is not necessary to my analysis in this case, it should be noted that comparable claims to appointment of appellate counsel have been brought under federal habeas corpus. *See Ross v. Moffitt*, 417 U.S. 600 (1974); *Evitts v. Lucey*, 469 U.S. 387 (1985).

protecting.  This is exactly what happened in that case.[9]  In contrast, in this case there is no perceivable obstacle to having the appointment-of-counsel issue raised by the defendants themselves.  Certainly there should be no difficulty in obtaining a lawyer to litigate the issue.  If the lawyer plaintiffs in this case are willing through their own efforts to support this litigation *as parties*, there is every reason to expect them to be just as willing to *represent* indigent defendants who have plea-bargained and want to appeal.  The only conceivable hurdle, then, to indigent state defendants' raising the appointment-of-counsel issue in the lower federal courts is that the abstention principles of *Younger v. Harris* apply.  It makes no sense, however, to view the circumvention of *Younger* principles as an affirmative basis for relaxing prudential standing requirements.  If anything, the principles underlying both *Younger* abstention and prudential standing should result in the same outcome, in this case deference to state court processes.  In short, plaintiff lawyers have cited no cases in which third-party standing was permitted solely in order to restore to the lower federal courts a class of cases that otherwise by application of federalism principles would have to be brought in the state courts, subject of course to direct review in the U.S. Supreme Court.

I concur in the majority's application of *Younger* to require abstention regarding the claims of the named indigent criminal defendants in this case.  I respectfully dissent from the grant of relief to the lawyers in this case who seek to litigate, as parties in federal court, the interests of future unascertained clients.

---

[9] *Caplin & Drysdale*, it should be noted, is also distinguishable from the instant case because it involved direct enforcement of criminal forfeiture provisions against property claimed by the plaintiffs.  See part II, *supra.*

---

## DISSENT

---

NORRIS, Circuit Judge, dissenting.  In discussing whether the equal protection component of our Federal Constitution requires the appointment of counsel to help indigent defendants prepare applications for review in the context of discretionary appeals, the Supreme Court has noted, "The question is not one of absolutes, but one of degrees."  *Ross v. Moffitt*, 417 U.S. 600, 612 (1974).  In this close case, I believe that the Majority Opinion cites to the proper authority and asks all of the right questions en route to its conclusion.  With all due respect, however, I believe that the protections provided by the Michigan statute at issue are sufficient to provide indigent defendants with meaningful access to the appellate system as defined by *Ross*.  Accordingly, I dissent.

The provisions of the challenged statute read as follows:

Sec. 3a.  (1) Except as provided in subsections (2) and (3), a defendant who pleads guilty, guilty but mentally ill, or nolo contendere shall not have appellate counsel appointed for review of the defendant's conviction or sentence.

(2) The trial court shall appoint appellate counsel for an indigent defendant who pleads guilty, guilty but mentally ill, or nolo contendere if any of the following apply:

(a)   The prosecuting attorney seeks leave to appeal.
(b)   The defendant's sentence exceeds the upper limit of the minimum sentence range of the applicable sentencing guidelines.
(c)   The court of appeals or the supreme court grants the defendant's application for leave to appeal.

(d)   The defendant seeks leave to appeal a conditional plea under Michigan Court Rule 6.301(C)(2) or its successor rule.

(3) The trial court may appoint appellate counsel for an indigent defendant who pleads guilty, guilty but mentally ill, or nolo contendere if all of the following apply:

(a)   The defendant seeks leave to appeal a sentence based upon an alleged improper scoring of an offense variable or a prior record variable.

(b)   The defendant objected to the scoring or otherwise preserved the matter for appeal.

(c) The sentence imposed by the court constitutes an upward departure from the upper limit of the minimum sentence range that the defendant alleges should have been scored.

(4)   While establishing that a plea of guilty, guilty but mentally ill, or nolo contendere was made understandingly and voluntarily under Michigan Court Rule 6.302 or its successor rule, and before accepting the plea, the court shall advise the defendant that, except as otherwise provided in this section, if the plea is accepted by the court, the defendant waives the right to have an attorney appointed at public expense to assist in filing an application for leave to appeal or to assist with other postconviction remedies, and shall determine whether the defendant understands the waiver. Upon sentencing, the court shall furnish the defendant with a form developed by the state court administrative office that is nontechnical and easily understood and that the defendant may complete and file as an application for leave to appeal.

Mich. Comp. Laws § 770.3a. By its own terms, the statute carves out significant exceptions to the denial of counsel to indigent defendants who have pleaded guilty. These

exceptions are designed to protect a defendant in those situations where he has the most at stake: when the prosecutor appeals; when the sentence falls above the sentencing range; and when he has preserved an issue by entering into a conditional plea.  We note that the Statute *requires* appointment of counsel under these circumstances.

In addition, the statute accords the trial court discretion to appoint counsel when there has been a dispute about the manner in which the sentence has been calculated or when an issue has otherwise been preserved for appeal.  Furthermore, the statute seeks to protect a defendant from waiving his rights to counsel unwittingly by requiring the court to explain the implications of a guilty plea with respect to appointment of counsel.  Of course, the trial court is constitutionally required to ensure that a plea is entered knowingly; nonetheless, a defendant's attention is explicitly drawn to the fact that, if he enters a guilty plea, he will not enjoy the assistance of appointed appellate counsel.

In *Ross, supra,* the Supreme Court was asked to extend the right to appointment of counsel for an appeal as of right, which was articulated in *Douglas v. California*, 372 U.S. 353 (1963), to the preparation of petitions for leave to appeal to either the United States Supreme Court or to North Carolina's highest court.  The Court declined to extend the right that far and, in so ruling, explained the constitutional underpinnings that guided its decision.  After first recounting how both the Due Process and Equal Protection Clauses have been invoked in this context, the Court explained that, in its view, the Equal Protection Clause provided the more compelling rationale:

> [I]t is ordinarily the defendant, rather than the State, who initiates the appellate process, seeking not to fend off the efforts of the State's prosecutor but rather to overturn a finding of guilt made by a judge or a jury below. The defendant needs an attorney on appeal not as a shield to protect him against being "haled into court" by the State and stripped of his presumption of innocence, but rather as a sword to

upset the prior determination of guilt.  This difference is significant for, while no one would agree that the State may simply dispense with the trial stage of proceedings without a criminal defendant's consent, it is clear that the State need not provide any appeal at all.  *McKane v. Durston*, 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894).  The fact that an appeal *has* been provided does not automatically mean that a State then acts unfairly by refusing to provide counsel to indigent defendants at every stage of the way. *Douglas v. California, supra.*  Unfairness results only if indigents are singled out by the State and denied meaningful access to the appellate system because of their poverty.  That question is more profitably considered under an equal protection analysis.

   . . . .

[T]here are obviously limits beyond which the equal protection analysis may not be pressed without doing violence to principles recognized in other decisions of this Court.  The Fourteenth Amendment "does not require absolute equality or precisely equal advantages," *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 24, 93 S.Ct. 1278, 1291, 36 L.Ed.2d 16 (1973), nor does it require the State to "equalize economic conditions." *Griffin v. Illinois*, 351 U.S., at 23, 76 S.Ct., at 592 (Frankfurter, J., concurring).  It does require that the state appellate system be "free of unreasoned distinctions," *Rinaldi v. Yeager*, 384 U.S. 305, 310, 86 S.Ct. 1497, 1500, 16 L.Ed.2d 577 (1966), and that indigents have an adequate opportunity to present their claims fairly within the adversary system. *Griffin v. Illinois, supra*; *Draper v. Washington*, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963).  The State cannot adopt procedures which leave an indigent defendant "entirely cut off from any appeal at all," by virtue of his indigency,

*Lane v. Brown*, 372 U.S., at 481, 83 S.Ct., at 771, or extend to such indigent defendants merely a "meaningless ritual" while others in better economic circumstances have a "meaningful appeal." *Douglas v. California, supra*, 372 U.S. at 358, 83 S.Ct. at 817.  The question is not one of absolutes, but one of degrees.  In this case we do not believe that the Equal Protection Clause, when interpreted in the context of these cases, requires North Carolina to provide free counsel for indigent defendants seeking to take discretionary appeals to the North Carolina Supreme Court, or to file petitions for certiorari in this Court.

*Ross*, 417 U.S. at 610-12 (footnote omitted).

   A month after the district court issued its injunctive order in the case before us, the Michigan Supreme Court released an opinion holding that the indigent defendants are not "entitled to the appointment of counsel at public expense when applying for leave to appeal a plea-based conviction." *Michigan v. Bulger*, 462 Mich. 495, 499, 614 N.W.2d 103, 104, *cert. denied*, 531 U.S. 994 (2000).  It offered the following rationale:

   Appeals from plea-based convictions and appeals from convictions obtained following trials, like those appeals at issue in *Douglas* and *Ross,* are fundamentally different. Foremost, a defendant who tenders a plea has admitted guilt of the offense in open court. "[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

. . . In contrast with trials, less danger exists in plea cases that the record will be so unclear, or the errors so hidden, that the defendant's appeal will be reduced to a meaningless ritual. Also, a concession of guilt limits considerably the potential issues that can be raised on appeal. These are all reasoned distinctions that are relevant to determining whether Michigan provides "meaningful access" to the appellate courts.

*Bulger*, 461 Mich. at 515-517, 614 N.W.2d at 112-13 (citations and footnote omitted).

Plaintiffs take issue with the distinction drawn by the Michigan Supreme Court between appeals of right and discretionary appeals. In their view, this emphasis is misplaced. Instead, the key is whether the appeal is a defendant's first appeal. Hence, this case is closer to *Douglas* than to *Ross* because the latter involved a discretionary appeal after the first appeal of right had been adjudicated. They point to the following language in *Douglas*: "[W]here the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor." *Douglas*, 372 U.S. at 357. They buttress the force of this observation by pointing out that, as of 1987, 47 states permitted first appeals as of right and that cases like *Anders v. California*, 386 U.S. 738, 744 (1967), referred to the right to have counsel advocate on one's behalf in the "first appeal."

As already mentioned, however, "[t]he question is not one of absolutes, but one of degrees." *Ross*, 417 U.S. at 612. While the appeal at issue in this case is undoubtedly a defendant's first appeal, it has also been rendered discretionary by his decision to plead guilty. The state has a fundamental interest in the finality of guilty pleas, *Hill v. Lockhart*, 474 U.S. 52, 58 (1985), and by entering a plea a defendant has voluntarily acknowledged that he does not dispute the factual basis of the state's case against him. Given that there has not been an underlying trial, the number

of issues for appeal has been greatly reduced.[1] Furthermore, the statute provides that a defendant can guarantee himself appointed appellate counsel by entering a conditional plea that preserves those issues that trial counsel has identified as viable on appeal. Mich. Comp. Laws § 770.3a(2)(d). In short, the protections built into the statute convince me that in this "matter of degrees" the balance tips in favor of constitutionality.

In addition to the protections built into the statute itself, Michigan's Supreme Court has interpreted its own court rules to "require trial counsel to assist the defendant in organizing and presenting to the trial court any potential appellate issues that warrant preservation." *Bulger*, 462 Mich. at 518, 614 N.W.2d at 113 (interpreting Mich. Ct. R. 6.005(H)(4), which provides that "[t]he responsibilities of the trial lawyer appointed to represent the defendant include . . . unless an appellate lawyer has been appointed, filing of postconviction motions the lawyer deems appropriate, including motions for new trial, for a directed verdict of acquittal, to withdraw plea, or for resentencing."). As a federal court, we are bound by Michigan's highest court's interpretation of the Michigan's court rules. *See Moore v. Sims*, 442 U.S. 415, 427 (1979) (noting "the primacy of the State in the interpretation of its own laws and the cost to our federal system of government inherent in federal-court interpretation and subsequent invalidation of parts of an integrated statutory framework").

In *Anders v. California*, 386 U.S. 738 (1967), the Supreme Court found unconstitutional California's practice of allowing

---

[1]It is worth noting that this court has upheld plea agreements in which defendants unconditionally waive the right to appeal. *See, e.g., United States v. Fleming*, 239 F.3d 761, 763-64 (6th Cir. 2001) (defendant in criminal case may waive the right to appeal); *United States v. Allison*, 59 F.3d 43, 46-47 (6th Cir. 1995) (same); *United States v. Ashe*, 47 F.3d 770, 775-76 (6th Cir. 1995) (same). While not completely analogous, it nonetheless strikes me as inconsistent that we would approve a practice that potentially cuts off all appellate avenues while striking down the Michigan scheme, which leaves limited, statutorily defined appellate remedies available to defendants.

a defendant's appointed counsel to review the defendant's trial record, and then withdraw from representation by submitting a letter to the reviewing court stating that, in his opinion, there existed no meritorious grounds for appeal. 386 U.S. at 743. The Court held, nonetheless, that the appointed counselor could ask to withdraw and opine on the merits of the case before the reviewing court if he attached to his request to withdraw "a brief referring to anything in the record that might arguably support the appeal;" the reviewing court would then have the ability to review the case and ask the counselor to remain as a representative of the defendant if the court found any meritorious grounds for appeal. *Id*. at 744. Though not obligatory on the States, such a process would pass constitutional muster. *Smith v. Robbins*, 528 U.S. 259, 272-73 (2000).

The Court in *Smith*, after reviewing *Evitts, Ross, Douglas*, and other cases dealing with an indigent defendant's right to counsel on appeal, stated that, in sum, the Constitution requires that "a State's procedure afford adequate and effective appellate review to indigent defendants, . . . [which it does] so long as it reasonably ensures that an indigent's appeal will be resolved in a way that is related to the merit of that appeal." *Smith*, 528 U.S. at 276-77 (internal quotations and citations omitted). In the case before us, even though the defendant's trial lawyer is only required to present "potential issues that warrant preservation" to the *trial* court, the defendant is nonetheless left with the benefits of a lawyer's review of the record and is not placed in the situation, condemned by the Supreme Court, "where the rich man . . . enjoys the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf, while the indigent . . . is forced to shift for himself." *Douglas v. California*, 372 U.S. 373, 358 (1963). Given that Michigan law requires a defendant's appointed trial lawyer to "assist the defendant in organizing and presenting to the trial court any potential appellate issues that warrant preservation," *Bulger*, 462 Mich. at 518, 614 N.W.2d at 113, and that the trial court is required to appoint appellate counsel if the appellate court grants leave to appeal, Mich. Comp. Laws

§ 770.3a(2)(c), I fail to see how Michigan's statutory scheme unconstitutionally bars an indigent defendant's meaningful access to the court system.

Finally, the Majority Opinion acknowledges that we are obliged to fill in the gaps left by the Supreme Court on this issue. To that end, I note that the Court denied certiorari in *Bulger, supra,* an opinion that came to a contrary conclusion on the practice, if not the actual statute, at issue in this case despite an entreaty from the dissent that the Court take the case to "correct the constitutional miscarriage committed by the majority." 462 Mich. at 522, 614 N.W.2d at 115 (Cavanagh, J., dissenting). While not dispositive of the matter before us, the Court's denial of certiorari strikes me as entitled to some weight in our effort to determine where, in this "matter of degrees," the Court might draw the line.

I respectfully dissent.